# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 7, 2012 Session

## STATE OF TENNESSEE v. DEXTER COX

**Appeal from the Criminal Court for Shelby County**
**Nos. 08-06538, 09-01393     Chris Craft, Judge**

---

**No. W2011-01429-CCA-R3-CD  - Filed January 9, 2013**

---

A Shelby County grand jury indicted appellant for first degree premeditated murder, first degree felony murder, attempted first degree murder, and especially aggravated robbery. A jury returned verdicts of guilty on both counts of first degree murder, the lesser-included offense of attempted second degree murder, and especially aggravated robbery, for which the trial court sentenced appellant to an effective sentence of life without the possibility of parole. Appellant challenges his convictions, claiming that his confession was the product of an illegal arrest and was involuntary. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Claiborne H. Ferguson and Bridgett Stigger, Memphis, Tennessee, for the appellant, Dexter Cox.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ray Lepone and Dean Decandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Appellant was charged in separate indictments for his involvement in the unrelated murders of three individuals, including the victim in this case, Herbert Wooten. He was also charged with the murder of Memphis police officer Lieutenant Ed Vidulich and a third person, Gwendolyn Cherry. Law enforcement first developed appellant as a suspect in the

Vidulich murder, which led to their discovering his involvement in the murder of the victim in this case. Prior to trial, appellant filed a motion to suppress his confession to the murder of Herbert Wooten.

## I. Facts from Hearing on Motion to Suppress

Sergeant William Merritt testified that he was a homicide investigator with the Memphis Police Department. He was the lead investigator in the present case as well as the case involving Ms. Cherry, who had been murdered in December 2007. Both homicides occurred in the Frayser area of Memphis, and a .40 caliber handgun was the murder weapon in both cases. Forensic testing from the Tennessee Bureau of Investigation ("TBI") confirmed that the same firearm was used in both murders. Until January 2008, Sergeant Merritt had not developed a suspect in the murders.

In the early morning hours of January 28, 2008, Sergeant Merritt received a call from his supervisor to respond to the home of Lieutenant Vidulich, who had been shot to death at his home. Sergeant Merritt became the lead investigator in that case as well. Lieutenant Vidulich lived on Shiloh Street, also in the Frayser area of Memphis. Sergeant Merritt learned that police discovered Lieutenant Vidulich's personal vehicle in flames on another street in the neighborhood. Officers checked the vehicle's registration, which led police to the murdered officer's home.

At Lieutenant Vidulich's home, Sergeant Merritt discovered three empty gun boxes inside a bedroom closet. He then learned that in July 2007, Lieutenant Vidulich had filed a police report indicating that his home had been burglarized while he was out of town. A few days prior to his death, Lieutenant Vidulich supplied the police with supplemental information about a potential suspect in the burglary. He contacted Officer Patrick[1], who took the original report in 2007, and told Officer Patrick that an individual who identified himself as "Tony Smith" claimed to have information regarding the burglary. When Officer Patrick arrived at Lieutenant Vidulich's home to obtain the supplemental information, "Tony Smith" was present and was interviewed by Officer Patrick. "Tony Smith" indicated that he worked at Colton's Steakhouse, that he lived on Haywood Avenue, and that he was a student at Frayser High School. He also gave the officers a cellular telephone number where he could be reached.

---

[1] Several officers are referenced by last name only. Those officers did not testify; thus, their first names are unknown.

During the investigation of Lieutenant Vidulich's murder, Sergeant Merritt asked Sergeant Eddie Bass[2] to research "Tony Smith" so that officers could question him further. Sergeant Bass canvassed the neighborhood where "Tony Smith" supposedly lived. He also visited Frayser High School on January 31, 2008, where he learned that an individual named Dexter Cox (hereinafter "appellant") had been arrested the previous day for possession of a weapon and firing a weapon across the street from the school. Based on this information, Sergeant Merritt retrieved the information on appellant's arrest and learned the circumstances of the arrest. After learning the serial number, make, and model of the weapon involved in appellant's arrest, Sergeant Merritt contacted Sergeant Collins and asked him to check the serial numbers on the empty gun boxes located in Lieutenant Vidulich's home. The serial number on a box that had contained a SIG Sauer 9 millimeter handgun matched the serial number listed on appellant's arrest warrant as the weapon he illegally possessed and fired.

While at Frayser High School, Sergeant Bass telephoned the number that "Tony Smith" had given to Officer Patrick and learned that the number belonged to appellant's mother. Sergeant Bass asked Officer Patrick to meet him at Frayser High School, where Officer Patrick viewed a photograph of appellant and identified him as "Tony Smith." Sergeant Merritt learned that the street address "Tony Smith" had provided to Officer Patrick during the interview was fictitious, but appellant had provided officers with a legitimate home address on Haywood Avenue when he was arrested the previous day.

Based upon the new information that appellant and "Tony Smith" were the same individual, the officers attempted to locate appellant. They learned that he was due to appear in general sessions court on the weapons charge that day, January 31st.[3] Sergeant Merritt, Lieutenant Mark Miller, and other officers went to general sessions court and located appellant standing in a hall near the courtroom. They escorted appellant upstairs to the homicide bureau and placed him in a large interview room at approximately 10:15 or 10:20 a.m. Appellant was calm and cooperative and did not appear to be intoxicated. He did not invoke his right to remain silent or demand a lawyer. After reading appellant his rights, Chief Toney Armstrong[4] and Lieutenant Barry Hanks conducted the interview of appellant while Sergeant Merritt continued with other aspects of the investigation.

---

[2] Sergeant Bass has since been promoted to the rank of lieutenant.

[3] During oral arguments before this court on August 7, 2012, the parties agreed that appellant had been released on bond following his arrest on January 30, 2008.

[4] Between the date of the hearing on appellant's motion to suppress and the date of his trial, Chief Armstrong was promoted to Director of the Memphis Police Department. For consistency, we refer to him as Chief Armstrong throughout the opinion rather than Chief at the suppression hearing and Director at the trial.

Sergeant Merritt learned that on the previous day, appellant had been arrested at the home of Dondriel Cunningham at 1515 Dalewood Avenue. Around the same time officers were interviewing appellant, Sergeant Merritt and Sergeant Quinn interviewed Mr. Cunningham. Mr. Cunningham told the officers that appellant visited his home and offered to sell him the 9 millimeter SIG Sauer. Mr. Cunningham informed appellant that he was not interested in purchasing a weapon at that time. Mr. Cunningham and appellant then went to appellant's home, where appellant showed him three other weapons he had for sale, including two .40 caliber semiautomatic handguns and a .38 caliber revolver. The other weapons were concealed in an orange newspaper bag and further hidden inside a vent in the wall. Mr. Cunningham again informed appellant that he was not interested in purchasing a weapon. Appellant replaced the weapons where they were hidden, and Mr. Cunningham and appellant then returned to Mr. Cunningham's residence. At Mr. Cunningham's residence, they went into the back yard, and appellant fired a shot into the air with the 9 millimeter SIG Sauer. A few moments later, a police officer from Frayser High School arrived, arrested appellant, and took him into custody.

By the time Sergeants Merritt and Quinn finished interviewing Mr. Cunningham, Chief Armstrong and Lieutenant Hanks had completed an interview with appellant but did not have a formal statement from him yet.[5] Sergeant Merritt learned that appellant's rendition of the facts was in conflict with Mr. Cunningham's statement. Appellant claimed that he and Mr. Cunningham found the weapon while walking through a "cut," and one of them kicked a bag that contained the gun.

A few hours later, Sergeant Merritt and Lieutenant Bass spoke with appellant. Although Sergeant Merritt did not think it was necessary to execute a second rights waiver form, he nonetheless advised appellant of his rights again orally and in writing. Appellant did not invoke his right to remain silent or demand an attorney. He did not express any threats or promises made by other police officers earlier that day or complain of any coercion. Appellant gave his first written statement and described the version of the events as he first told officers earlier in the day. Sergeant Merritt confronted appellant with the fact that the 9 millimeter handgun he possessed and fired had been taken from Lieutenant Vidulich's home, but appellant maintained the story about finding the gun in a "cut." Sergeant Merritt explained to appellant that he would be taken into custody on potential charges of theft of property and aggravated burglary. Appellant informed Sergeant Merritt that he was tired and wanted to get some sleep. Around 10:30 p.m., he requested to be

---

[5] The record reflects that appellant gave three formal statements: (1) a written statement regarding his involvement in the burglary of Lieutenant Vidulich's home and theft of property; (2) a written statement confessing to the murder of Lieutenant Vidulich; and (3) a tape-recorded statement confessing to the murder of Herbert Wooten.

booked into jail so he could rest. On the way to the intake area, appellant asked what the charges were. Sergeant Merritt explained that he was not charged with anything at that time but that he was being booked on a "48-hour hold for aggravated burglary and theft of property." Appellant asked where he was going to serve his sentence and asked if Sergeant Merritt thought he might be charged with voluntary manslaughter. In response, Sergeant Merritt told appellant, "[I]f there's some stuff you want to talk about now about Lieutenant Vidulich's death[,] we can go back up there and we can go on and get all of this out." Appellant told him, "[N]o . . . let me sleep. I want to get some sleep . . . in the morning, I'll tell y'all the truth. I'll tell you everything that happened."

On the morning of February 1, 2008, Sergeant Merritt again interviewed appellant at the homicide bureau. He advised appellant of his rights in printed form. Appellant changed aspects of his first statement concerning the burglary and theft of Lieutenant Vidulich's gun, which caused officers to temporarily pause the interview so they could obtain statements from various witnesses he mentioned, including potential alibi witnesses. Officers gave appellant a snack, a drink, and a restroom break. He took a two- to three-hour nap during that time. Later that evening, Detective Paul Sherman arrived and began an interview with appellant that resulted in appellant's second written statement. Chief Armstrong joined them. Sergeant Merritt began observing the interview via closed circuit television around 9:30 p.m. He did not observe appellant ask for an attorney, invoke his right to remain silent, or hear any promises or threats against appellant.

On February 21, 2008, Sergeant Merritt met with Barbara Wooten, widow of Herbert Wooten, the victim in this case. He showed Mrs. Wooten a photograph array from which she positively identified appellant as her husband's killer.

On cross-examination, Sergeant Merritt acknowledged that officers believed that Lieutenant Vidulich's guns had been stolen because the boxes that would have contained them were empty. He did not check Lieutenant Vidulich's residence in Florida or check with his wife to determine if the firearms were located elsewhere. Sergeant Merritt explained the concept of a "48-hour hold," stating, "It's a form that we fill out that's reviewed by a judicial commissioner that allows us to detain a person if there's probable cause to do so to continue an investigation." He further explained that the requirement was relatively new, having been in effect for a only a few years. Previously, officers could hold someone for seventy-two hours without appearing before a magistrate. Sergeant Merritt clarified that with regard to the Vidulich case, appellant gave a written statement to him and Sergeant Bass on the first day and a second written statement to Chief Armstrong and Detective Sherman on the second day. He also gave a third statement, the tape-recorded statement regarding the Wooten and Cherry cases.

Chief Toney Armstrong, deputy chief over Division One Uniform Patrol, testified that he was assigned to the homicide division in 2008 and was involved in the investigation involving the death of Lieutenant Vidulich. After appellant was taken into custody outside of general sessions court, Chief Armstrong advised appellant of his rights. They interviewed appellant regarding how he came into possession of the pistol that belonged to Lieutenant Vidulich. Appellant stated that he and a friend had found the weapon in a bag while they were walking through a field. Chief Armstrong also asked appellant about Lieutenant Vidulich's vehicle, and appellant indicated that he had seen the vehicle burning. Appellant never indicated that he wanted a lawyer or wanted to invoke his right to remain silent. Chief Armstrong did not threaten, coerce, or make any promises to induce appellant to give the statements.

On February 1, 2008, Chief Armstrong watched an interview, via closed circuit television, of appellant conducted by Detective Sherman in which appellant admitted to killing Lieutenant Vidulich. Chief Armstrong entered the room at the conclusion of the interview and informed appellant that they needed to take a formal statement at that point. Appellant initialed all ten pages of the resulting type-written statement and signed it.

At the conclusion of the interview during which appellant confessed, Chief Armstrong made him aware that he was suspected in two other murder investigations because they had ballistics reports matching the murder weapon in Lieutenant Vidulich's case with two other murder victims. Because of the late hour, Chief Armstrong taped the next interview and had the tape transcribed, rather than conducting a formal question-answer type-written interview. The subsequent interview, which resulted in appellant's third statement to law enforcement, began at approximately 12:30 a.m. on February 2, 2008. Appellant never indicated that he was tired or wanted to cease the interview. He remained cooperative the entire time.

On cross-examination, Chief Armstrong recalled that after appellant confessed to killing Lieutenant Vidulich, he became very emotional and started crying. Appellant told Chief Armstrong "that he was pretty much relieved because he felt that he was dangerous." Appellant said "that he felt powerful with a gun in his hand. . . . He couldn't explain the feeling that he [got] when [he killed] somebody and that he really needed some help." At the end of the question-answer transcribed interview, Chief Armstrong asked appellant if he gave the statement freely and voluntarily without any threats, promises, or coercion. Appellant answered that "an officer told me that if I tell the truth[,] he would help me get a lighter charge than constantly lying." Chief Armstrong acknowledged that the ballistics report from the TBI was available prior to the interview during which appellant confessed to killing Lieutenant Vidulich, but they did not inform him of the ballistics match until he had confessed. The Vidulich interview ended at 11:50 p.m., and the Wooten/Cherry interview began at 12:30 a.m.

Appellant testified that he first told Sergeant Merritt that he and Mr. Cunningham found the weapon in a "cut" but that Sergeant Merritt "forced" him to "come up with another story because [their] statement[s] didn't match up." He then said he was alone when he found the gun. He testified that Sergeant Merritt and Chief Armstrong tried to persuade him to confess to the murder of Lieutenant Vidulich during the first day of questioning, but he told them he was tired and wanted to go to sleep. He denied having a conversation with Sergeant Merritt about wanting to give a statement the next day or about voluntary manslaughter.

Appellant estimated that he was brought upstairs to the homicide bureau on February 1, 2008, between 9:00 a.m. and 10:00 a.m. He claimed that because he did not immediately confess to the Vidulich murder, Chief Armstrong and Detective Sherman took his family into custody. He said officers threatened to "lock up" his mother and stepfather and send his siblings to child services. He said officers handcuffed his parents. Appellant testified that officers tried to get him to say that his stepfather was in possession of weapons and threatened to arrest his stepfather for being a felon in possession of a firearm if appellant did not confess. He said that officers eventually arrested his stepfather, charged him with two counts of being a felon in possession of a firearm, and sent him to a federal facility. He also said his mother was handcuffed, and officers threatened to arrest her for allowing prohibited firearms in her home. Appellant said he was told that his parents would be released if he confessed.

Appellant explained that when he was alone with Detective Sherman, Detective Sherman told him that the 48-hour hold was about to expire and that if he confessed to the Vidulich murder, Detective Sherman would charge him with a lesser-included offense of murder. He said that he confessed to secure the release of his parents and to insure he would be charged with a lesser offense.

On cross-examination, appellant explained that Sergeant Merritt "forced" him to change his story by telling him that the statements did not match up and that he needed to tell the truth. He claimed that Sergeant Merritt "was throwing the death penalty in [his] face" because an officer had been murdered, and appellant was in possession of the officer's handgun. He further stated that on the first night of questioning when he told Sergeant Merritt that he did not want to talk anymore, he meant he did not ever want to talk to them again. He said he did not tell officers he wanted to talk to them the following day, and they just retrieved him from downstairs the next morning. He acknowledged that he nonetheless signed waiver of rights forms the following day.

The State called Sergeant Merritt on rebuttal. He confirmed that during appellant's first statement, he mentioned his mother, stepfather, and brother as alibi witnesses, and

Sergeant Merritt wanted to speak with them. Sergeant Collins had already been dispatched to secure appellant's residence because they had learned that three handguns were hidden there. Officers were in the process of obtaining consent to search but decided that a search warrant would be more appropriate. In the meantime, appellant's family members were escorted to the homicide bureau, but they came voluntarily. They were not handcuffed. All three family members spoke to Sergeant Merritt willingly and gave statements. The family members then left. Sergeant Merritt confirmed that they were free to leave the entire time.

Sergeant Merritt recalled that the formal Vidulich statement, appellant's second statement, began around 10:30 p.m. He thought that appellant's third statement, the result of the Wooten/Cherry tape-recorded interview, ended between 12:30 and 12:50 a.m. During the tape-recorded interview, appellant told officers that he threw the guns in the Mississippi River but later indicated that the weapons were located in a residence on Haywood Avenue, not far from appellant's home. Appellant said that he and his stepfather moved the guns. Eric Williams, appellant's stepfather, was arrested later that morning at M&M Bail Bond Company for public intoxication and driving on a suspended license. He was subsequently charged with two counts of being a convicted felon in possession of a handgun.

The trial court denied appellant's motion to suppress, finding that appellant's statements were freely and voluntarily made and were constitutionally obtained.

## II. Facts from Trial

This case involves crimes against Herbert and Barbara Wooten at their home in Shelby County, Tennessee. Mrs. Wooten, the victim's widow[6], testified that she and the victim lived at 1812 Pinedale Avenue on October 25, 2007. To supplement their retirement income, the victim repaired lawn mowers, weed eaters, and neighbors' cars. He also sold unclaimed repaired items by displaying them in their front yard. When they had items outside to sell, Mrs. Wooten would either sit inside the house or on the porch to watch for customers. She acknowledged that the victim always carried a 9 millimeter handgun in a holster on his belt with a badge attached to the belt indicating that the weapon was lawful.

Mrs. Wooten testified that on the evening of October 25, 2007, shortly before 6:00 p.m., she and the victim were inside their home watching the evening news on television. She was sitting on a couch with a view of the porch area overlooking the street. Appellant knocked on the door, and the victim went outside and spoke with him. The victim informed appellant that the treadmill on the porch was for sale for $20, and appellant replied that he

---

[6] Although Mrs. Wooten was herself a victim of attempted murder, our use of the term "victim" in this case refers to the deceased victim, Herbert Wooten.

would return shortly with the money. Mrs. Wooten remained seated, and the victim waited outside on the porch for appellant to return. He returned, and shortly thereafter, Mrs. Wooten heard a gunshot. She testified that she witnessed appellant shoot the victim. She then rose from the couch, and appellant shot her in the stomach. Mrs. Wooten stated, "I seen [sic] him – he shot me, then he shot [the victim] again two more times." Appellant then ran away, and Mrs. Wooten crawled to the telephone to call 9-1-1.

Mrs. Wooten acknowledged that she identified appellant from a photograph display and that she had observed him several times in the months preceding this incident as he walked up and down the street in front of her home.

On cross-examination, Mrs. Wooten testified that the victim had carried a gun for the last two years "[b]ecause he was shot at two years earlier." She stated that he carried it for their protection. Mrs. Wooten explained that the sale items were normally displayed in the yard, not on the porch. The neighbors would interact with the victim in the yard, and appellant was the only person who came up on the porch.

Freddie Freeman, a neighbor who lived across the street from the Wootens, testified that he was at his mailbox on the evening of the incident when he saw the victim sitting on his porch, smoking a cigarette. In summarizing his observation, he stated, "It happened – dude walked up on the porch, walked halfway up with his gun, shot the glass door and shot Mr. Wooten. Mr. Wooten was laying [sic] like this here to the side." Subsequently, appellant covered his head with a hood, removed the victim's gun from the holster, and ran away.

Marc Kloek, a patrol officer with the City of Memphis Police Department, was the first officer on the scene and observed an elderly white male lying in the leaves off the porch area. He checked the man for a pulse and found none. He then observed a female on the floor inside the house, seemingly alive, and another person inside with her. After confirming that an ambulance was en route, he secured the crime scene and began gathering information for the incident report.

Jeffrey Garey, an officer in the Crime Scene Investigation Unit of the Memphis Police Department, identified all of the exhibits at trial. He confirmed that he received into evidence five "spent .40 cal. S&W bullet casing[s]" and one spent bullet.

Dr. Marco Ross, Deputy Chief Medical Examiner at the Shelby County Medical Examiner's Office, testified as an expert in forensic pathology. Dr. Ross identified a total of four gunshot wounds to the victim's body, three to the torso area and one to the right thigh. The routine toxicology analysis indicated no intoxicating drugs or alcohol in the

victim's body, and Dr. Ross ruled the cause of death to be gunshot wounds and the manner of death to be a homicide.

Dondriel Cunningham, a friend and former classmate of appellant, testified that appellant came to his home in January 2008 and informed him that he had a gun for sale. Mr. Cunningham was interested in purchasing a gun, so he went to appellant's home to inspect the gun. Upon arrival, appellant brought out five guns for him to inspect, a .38 caliber handgun, two .40 caliber handguns, one 9 millimeter handgun, and a sawed-off shotgun, all contained in an orange plastic bag similar to a newspaper bag.[7] Mr. Cunningham testified that he agreed to buy the 9 millimeter handgun, and they proceeded to Mr. Cunningham's house for him to retrieve money for payment. When they arrived at Mr. Cunningham's house, appellant fired the weapon to be sure it worked satisfactorily. Appellant fired the weapon twice into the air. Because Mr. Cunningham's house was located across the street from Frayser High School, the shots were heard by the school resource officer, who came to the scene and arrested appellant.

Mr. Cunningham testified that he had observed appellant carrying a gun before, usually the .38 caliber weapon appellant was selling. Mr. Cunningham identified a .40 caliber weapon as one of the weapons appellant had for sale.

Sergeant Merritt was the lead investigator in the Wootens' case. When he arrived at the scene of the shooting, he observed the deceased victim and noted that the window in the door had been shot out. He also saw a few shell casings and officers securing the scene. As he looked at the victim, Sergeant Merritt noticed an empty holster on the right side of the victim's hip. He talked with witnesses on the scene. Mr. Freeman told Sergeant Merritt that he observed a black male run onto the victim's porch, fire two shots at the victim, fire another shot at the lady through the door, and then fire another shot at the victim lying on the porch. Mr. Freeman also told him that he observed the black male lean over the victim, take the gun out of the holster, and flee the scene on foot. Sergeant Merritt testified that the victim's gun was later found in the possession of a third party during a traffic stop in March 2011. Police recovered the weapon used in the instant case, a Smith and Wesson Model SW 40V, after a search of the home to which appellant had relocated the handguns.

Chief Armstrong testified that in October 2007, he was a lieutenant in the homicide bureau at the police department. He was one of the officers who interviewed appellant after his arrest in January 2008. Chief Armstrong stated that appellant admitted to him that he was the person responsible for shooting Mr. and Mrs. Wooten. He recalled that appellant's

---

[7] At the suppression hearing, Sergeant Merritt's testimony concerning Mr. Cunningham's statement did not include a reference to a sawed-off shotgun.

reason for his actions was that he wanted the victim's gun so he could sell it. Appellant admitted to Chief Armstrong that he "like[d] guns" and that he "like[d the feeling that [he had] when a gun is in [his] hand." Chief Armstrong remembered that appellant was extremely emotional and that "[h]e cried uncontrollably." He testified that approximately thirty minutes elapsed between his first interview with appellant and the formal tape-recorded interview during which appellant regained his composure. On the recording, appellant said he threw the victim's weapon away, and the weapon he used to kill the victim was in the Mississippi River. After the first few questions, Chief Armstrong noted that appellant was not telling the same version about the treadmill for sale and his leaving and coming back to the victim's home.

Mark Jordan, an officer with the Memphis Police Department, was asked to go to 1712 Haywood Street because officers had received information that appellant confessed that firearms were being stored at this residence. One particular firearm, a Smith and Wesson Sigma .40 caliber, was also believed to be at this residence. He stated that officers conducted a consensual search and found the Smith and Wesson Sigma .40 caliber handgun in the back yard. A .38 caliber revolver was recovered from the top of a rear tire of a vehicle in the carport. Officers also recovered ammunition.

Cervinia Braswell, a special agent of the TBI assigned as a forensic scientist to the Firearms Identification Unit, testified as an expert in ballistics and firearms identification and comparison. Agent Braswell testified that the five .40 caliber shell casings and two bullets she received from the Memphis Police Department were all fired from the Smith and Wesson .40 caliber handgun.

The jury convicted appellant of first degree felony murder and first degree premeditated murder, which the trial court merged; the lesser-included offense of attempted second degree murder of Ms. Wooten; and especially aggravated robbery. The trial court imposed an effective sentence of life in prison without the possibility of parole. After an unsuccessful motion for new trial, this appeal follows.

III. Analysis

Appellant raises two Fourth Amendment issues for our review. First, he argues that when he gave his incriminatory statement, he was being held unlawfully. Second, he maintains that his statement was not voluntary due to promises of leniency and threats of death.

### A. Was Appellant's Statement Obtained Pursuant to a Lawful Arrest Supported by Probable Cause?

Prior to trial, appellant filed a motion to suppress, and the trial court held a hearing. The trial court denied the motion, reciting the reasons therefor in a written order.

At a hearing on a motion to suppress, the State has the burden of proving by a preponderance of the evidence that appellant's statements were knowingly, voluntarily, and intelligently given. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). If appellant was afforded an evidentiary hearing on the merits of a motion to suppress, we attribute the factual findings of the trial court the weight of a jury verdict on appeal. *State v. Makoka*, 885 S.W.2d 366, 371 (Tenn. Crim. App. 1994). We review the trial court's legal conclusions denying a motion to suppress de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008) (citations omitted). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

We begin with the proposition that "[b]oth the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Our supreme court has recognized three categories of police interactions with private citizens: "(1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." *Id.* (citing *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)). "'While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not.'" *Id.* (quoting *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006)).

An arrest supported by probable cause is an exception to the warrant requirement. *Id.* at *7 (citing *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009)); *see Brown v. Illinois*, 422

U.S. 590, 598 (1975). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, at *7 (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)); *see Beck v. Ohio*, 379 U.S. 89, 91(1964). "'Probable cause must be more than a mere suspicion.'" *Echols*, at *7 (quoting *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005). However, probable cause "'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" *Id.* (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). Moreover, a determination of probable cause encompasses the accumulation of information known to law enforcement collectively if a sufficient nexus of communication exists between the arresting officer and a fellow officer with pertinent knowledge. *Echols*, at *7 (citation omitted).

We must first determine the nature of the interaction between appellant and law enforcement. Officer Merritt testified that at the time appellant was booked into jail, he was not being charged with anything but was being detained on "48-hour hold for aggravated burglary and theft of property." The Memphis Police Department's policy of detaining suspects pursuant to a "48-hour" hold has been criticized by this court. *See State v. Courtney Bishop*, No. W2010-01207-CCA-R3-CD, 2012 WL 938969, at *7 (Tenn. Crim. App. March 14, 2012) ("This court has repeatedly noted the illegality of the procedure and warned the Memphis Police Department specifically against its use."), *perm. app. granted*, No. W2010-01207-SC-R11-CD (Tenn. Aug. 12, 2012). As in *Courtney Bishop*, the record in this case "establishes that, despite the officer's insistence that the defendant was merely to be held for 48 hours, the seizure in this case was a full-scale arrest." *Id.* Accordingly, it follows that appellant's warrantless arrest must have been supported by probable cause.

Appellant was detained or arrested on the charges of theft of Lieutenant Vidulich's handguns and aggravated burglary of his home. Tennessee law recognizes that "the possession of recently stolen goods, if not satisfactorily explained, gives rise to the inference that the possessor has stolen them, *Bush v. State*, 541 S.W.2d 391 (Tenn. 1976); *State v. Land*, 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984), and has committed the burglary antecedent to the theft. *State v. Hamilton*, 628 S.W.2d 742, 746 (Tenn. Crim. App. 1981) (citations omitted)." *State v. Andrew William Byers and Larry Wayne Key,* No. 01C01-9601-CC-00002, 1997 WL 488621, at *5 (Tenn. Crim. App. Aug. 22, 1997). Moreover, appellant changed his testimony about how he came into possession of the gun, and officers discovered that appellant was actually the informant "Tony Smith" who had been at Lieutenant Vidulich's house and claimed to have information about the theft and burglary. In addition, Mr. Cunningham testified that appellant tried to sell the stolen property to him. Thus,

officers clearly had probable cause to arrest appellant for theft of property and aggravated burglary before he confessed to the murder of Herbert Wooten. The trial court properly declined to exclude appellant's subsequent confession to the murder of the victim on the basis of an allegedly illegal arrest.

## B. Was Appellant's Statement Involuntary?

Appellant challenges the admission of his confession, claiming that it was obtained through promises of leniency and coercion.

"The Fifth Amendment to the United States Constitution provides in part that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005) (quoting U.S. Const. amend. V). "Similarly, Article I, section 9 of the Tennessee Constitution states that 'in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.'" *Id.* (quoting Tenn. Const. art. I, § 9). Notwithstanding, an accused may waive his right against self-incrimination. *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The accused's waiver of his right against self-incrimination under *Miranda* must be made intelligently, knowingly, and voluntarily to be held constitutional. *Id.* (citing *Miranda*, 384 U.S. at 444).

> The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper *Miranda* warnings have been issued. Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. It must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. This has evolved into the "totality of circumstances" test to determine whether a confession is voluntary.

*Id.* (internal citations omitted). Thus, to determine whether an accused's statements were voluntary, the appellate courts review the totality of the circumstances surrounding the waiver of the right against self-incrimination. *Id.* at 249 (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)).

Appellant does not contest that the waiver of his *Miranda* rights was made freely, voluntarily, and intelligently. Rather, he claims that his statements were coerced by law enforcement by promises of leniency and threats of death. He maintains that law

enforcement assured him that if he confessed, he would be charged with a lesser-included offense, and police threatened him with the death penalty if he did not confess.

"In Tennessee, promises of leniency by state officers do not render subsequent confessions involuntary per se: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are compelled by promises of leniency.'" *State v. Craig Everett Shears*, No. E2004-00797-CCA-R3-CD, 2005 WL 2148625, at *8 (Tenn. Crim. App. Sept. 7, 2005) (quoting *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). The transcript from the suppression hearing indicates that law enforcement officers advised appellant of his rights several times, both in writing and orally. He did not tell any officer that he did not understand his rights. He never indicated that he wished to speak with an attorney nor did he indicate that he wanted to invoke his right to remain silent. At the time appellant was indicted for the Wooten murder, he was nearly twenty years of age. There was no evidence that appellant was intoxicated when he was arrested and questioned on the first day, and after having been detained for over twenty-four hours before confessing to the Wooten murder, appellant was not intoxicated when he gave the statement in question. From the record before us, we cannot conclude that appellant's statement was compelled by promises of leniency.

With regard to appellant's argument concerning the imposition of the death penalty, he acknowledged on cross-examination that he did not mention this "threat" during his direct testimony. The trial court ruled on the credibility of witnesses, noting that appellant "volunteered gratuitously" that he had been threatened with the death penalty and stating that appellant "appeared less than credible during his testimony. The two police officers appeared very credible." The record supports the trial court's findings of fact and the legal conclusions drawn therefrom. *See State v. Morgan*, 825 S.W.2d 113, 116 (Tenn. Crim. App. 1991) (affirming conviction where appellant claimed that police alluded to the death penalty if he did not talk, but if he gave a confession, police assured him they would talk to the prosecutor about charging him with manslaughter).

Appellant raises the issue that "[p]olice officers further promised that family members of appellant, who had been arrested by police during his questioning, would be let go. This was another lie on the part of the Memphis Police Department." Appellant's assertions are unsupported by the record. Sergeant Merritt testified that he wanted to interview appellant's family members because appellant had named them as alibi witnesses. The family members freely agreed to be interviewed at the police department, and they were escorted from their home by officers. No member of the family was handcuffed. Each member voluntarily gave a statement and was free to leave at any time. At the conclusion of the interviews, the family members left the police department. Appellant's stepfather was subsequently arrested in the early morning hours of February 2, 2008, in the parking lot of a bonding company, for public

intoxication and driving on a revoked license. The charges for being a convicted felon in possession of handgun were added at a later time.

Although appellant testified that he witnessed his family members in handcuffs and that officers threatened to arrest his family, the trial court credited the testimony of the officers and discredited appellant's testimony. The record supports the trial court's ruling. Appellant is not entitled to relief on this issue.

Even if admission of appellant's confession was error, it was harmless. The scope of our harmless error review is found in Tennessee Rule of Appellate Procedure 36(b):

> A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

When appellate courts conduct a harmless error review, our "'analysis is more than simply a calculation of whether sufficient evidence exists to support the conviction.'" *State v. Ferrell*, 277 S.W.3d 372, 380 (Tenn. 2009) (quoting *State v. Rodriguez*, 254 S.W.3d 361, 374 (Tenn. 2008)). Appellate courts must carefully examine the entire record to determine whether the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *Id*. (quoting *Rodriguez*, 254 S.W.3d at 374).

Mrs. Wooten testified that she identified appellant from a photograph array as the individual who shot her husband. Moreover, she was familiar with appellant because she had seen him in the neighborhood on prior occasions. Identity of the perpetrator was never an issue. A short time after Mr. Wooten was murdered, Dondrell Cunningham observed appellant in possession of several weapons, including a .40 caliber handgun. Officers subsequently located the murder weapon, a .40 caliber handgun, at a location to which appellant and his stepfather relocated several guns. Ballistics testing linked the .40 caliber handgun over which appellant exercised control to the bullets and shell casings retrieved during the investigation of Herbert Wooten's murder. Based on the record before us, we cannot say that any error in admitting appellant's confession "more probably than not affected the judgment . . . " *Id.* Appellant is not entitled to relief on this issue.

## CONCLUSION

Following our review of the record, the briefs, arguments of counsel, and applicable case law, we find no error and affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE